# EXHIBIT D

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

KOHCHISE JACKSON,

Plaintiff,

v.                                                  Case No.: 2:19-cv-13382

                                                    Hon.:  Terrence G. Berg
                                                    Mag.: Patricia T. Morris

CORIZON HEALTH, Inc**.,**
a Delaware corporation.,
PRIME HEALTHCARE SERVICES – PORT HURON, LLC,
a Delaware limited liability company,
KEITH PAPENDICK,
COLLEEN MARIE SPENCER, and
DAVID A. KRAUS,

                                                            JURY DEMAND

Defendants.

---

Laurence H. Margolis (P69635)
*Margolis, Gallagher & Cross*
Attorneys for Plaintiff
214 S. Main St., Suite 200
Ann Arbor, MI 48104
(734) 994-9590

---

**COMPLAINT**

Plaintiff KOHCHISE JACKSON, by and through his attorneys,

MARGOLIS GALLAGER & CROSS, brings this action for legal and equitable

relief against Defendants for deprivation of Plaintiff's federally protected civil

rights pursuant to 42 U.S.C § 1983. For his cause of action against Defendants,

Plaintiff respectfully states as follows:

## JURISDICTION AND VENUE

1. This action is brought against the Defendant pursuant to 42 U.S.C § 1983 for deprivation of civil rights secured by the Eighth and Fourteenth Amendments to the United States Constitution.

2. Jurisdiction is founded upon 28 U.S.C. §1331, §1343(a)(3)(4), and §1367(a). This Court has jurisdiction over the Plaintiffs' claims of violation of civil rights under 42 § U.S.C. 1983. Relief is authorized pursuant to 28 U.S.C. §§2201, 2202; and 42 U.S.C. §1983.

3. Venue is proper in this Court pursuant to 28 U.S.C. §1391 in that factual acts and omissions which give rise to this cause of action occurred within this jurisdictional district.

## THE PARTIES

4. Defendant Corizon Health, Inc. is a for-profit Delaware corporation that contracts with state and municipal governments to provide healthcare to incarcerated persons. Corizon Health, Inc. and its corporate predecessors have been the healthcare provider for the Michigan Department of Corrections since 1998.

5. Defendant Prime Healthcare Services – Port Huron LLC is a for-profit Delaware limited liability company doing business in Michigan under the name "Lake Huron Medical Center."

6. On or about August 31st, 2015, Defendant Prime Healthcare Services – Port Huron LLC purchased the hospital assets located at 2601 Electric Ave., Port Huron, Michigan, from Trinity Health – Michigan Inc., and extended offers of continued employment to all Trinity employees at the 2601 Electric Ave. facility.

7. On information and belief, at the time of its purchase of the aforementioned hospital assets, Defendant Prime Healthcare Services – Port Huron LLC assumed Trinity's contract with the County of St. Clair to provide medical services to inmates at the St. Clair County Correctional Facility.

8. Defendant Colleen Marie Spencer, F/K/A Colleen Marie Dewan, was, at all times relevant to this Complaint, employed by Defendant Prime Healthcare Services – Port Huron LLC as its Facility Coordinator for the St. Clair County Correctional Facility.

9. Defendant Keith Papendick, M.D. is a medical doctor who was, at all times relevant to this Complaint, employed by Defendant Corizon Health, Inc. as a Director of Utilization Management at its Lansing office.

10. Defendant Dr. David A. Kraus, D.O. is a medical doctor who provided treatment to Plaintiff and other detainees at the St. Clair County Correctional Facility.

11. Plaintiff Kohchise Jackson was a pretrial detainee at the St. Clair County Correctional Facility from on or about May 17th, 2016 to March 23rd, 2017, and a prisoner in the custody of the Michigan Department of Corrections from on or about March 23rd, 2017 to May 16th, 2019.

**COMMON ALLEGATIONS**

12. In or around July of 2016, while he was a pretrial detainee at the St. Clair County Correctional Facility, Mr. Jackson developed a colovesical fistula. Mr. Jackson was thirty-four years old at the time.

13. A colovesical fistula is a hole in the tissue that separates the large intestine from the bladder.

14. Due to the fistula, bowel contents such as feces and intestinal gas escaped out of Mr. Jackson's large intestine and into his bladder, causing bladder infections, urinary tract infections, high fevers, chills, nausea, vomiting, and extreme pain.

15. From July through December of 2016, Mr. Jackson complained to various staff at the St. Clair County Correctional Facility that he was experiencing high fevers, nausea, vomiting, and severe pain in his groin area. He also reported that he was "farting out my penis" and that feces was coming out in his urine.

16. In response to his requests for medical attention, Mr. Jackson was seen by Defendant Dr. David A. Kraus at the jail at least four times between July and December of 2016.

17. On each examination, he was diagnosed with a urinary tract infection and prescribed an antibiotic, despite the fact that he exhibited symptoms of a fistula such as passing gas and feces through his urethra.

18. The only possible cause of "fecaluria," the condition of feces passing out of the urethra in the patient's urine stream, is a fistula.

19. Mr. Jackson was finally transported to an emergency room at a local hospital on or about December 6th, 2016. ER staff correctly diagnosed the colovesical fistula, and Dr. Erina Kansakar elected to treat it via Hartmann's procedure.

20. Hartmann's procedure is an emergency surgical procedure used in situations involving a pathology in the sigmoid colon or rectum that makes primary anastomosis (cutting out the damaged section of colon and connecting the two ends) unsafe.

21. Treatment using the Hartmann procedure typically consists of two steps. First, the large intestine is cut upstream from the pathology and diverted out through the patient's skin. Following the first operation, the patient passes gas and feces through the resulting stoma, into a colostomy bag. The pathology in the downstream section of the colon is also addressed in the first operation. After

the downstream section of colon has had time to heal, a second operation is performed to reconnect the two sections of colon and close the stoma. After the reversal operation the patient will again pass gas and feces out of their anus.

22.  Mr. Jackson underwent the first planned surgery on or about December 10th, 2016. His colovesical fistula was closed, a temporary stoma was created on the left side of his abdomen, and the resulting rectal stump was sewn shut. At the time of the initial operation, Mr. Jackson's plan of care included a colostomy reversal operation some time in February 2017. See Ex. A: *Selected Medical Records from Lake Huron Medical Center, 12/12/16*.

23.  Dr. Kansakar saw Mr. Jackson for a post-surgical follow-up appointment on or about January 12th, 2017. Dr. Kansakar determined that Mr. Jackson was recovering normally from the initial surgery and scheduled his colostomy reversal operation for February 9, 2017. See Ex. B: *Medical Record for January 2017 Appointment with Dr. Erina Kansakar*.

24.  However, Mr. Jackson's colostomy reversal surgery did not occur as scheduled on February 9, 2017. Defendant Colleen Marie Spencer "postponed" the surgery for a nonmedical reason, pursuant to an official policy, practice, or custom of her employer, Prime Healthcare Services – Port Huron LLC.

25.  Defendant Spencer postponed the surgery because it was not "emergent or life-threatening." See Ex. C: *St. Clair County Jail Inmate Medical Grievances for*

*Kochise Jackson*; Ex. D: *Letter from Kohchise Jackson to Jail Supervisor, February 21st, 2017.*

26. On information and belief, Defendant Spencer postponed Mr. Jackson's surgery in order to pass the cost of the surgery onto the Michigan Department of Corrections ("MDOC") and/or MDOC's inmate healthcare contractors. Defendant Spencer knew that Mr. Jackson would soon be transferred to a state prison, at which point MDOC, rather than St. Clair County and Prime Healthcare Services – Port Huron LLC, would be responsible for his healthcare needs.

27. Mr. Jackson was transferred to MDOC custody on or about March 23rd, 2017. Prior to transfer, he was told by medical staff at the St. Clair County Correctional Facility that he would receive the colostomy reversal surgery after he arrived in prison.

28. Per its contract with MDOC, Defendant Corizon Health, Inc. is responsible for inmate healthcare within the Michigan prison system.

29. Defendant Corizon Health, Inc. employs at least one "Medical Provider" (hereafter "MP") at each Michigan prison.

30. The MPs employed by Corizon are typically Physician's Assistants or Nurse Practitioners. Corizon's MPs cannot refer a prisoner for any off-site care, such

as appointments with specialists, MRIs, surgeries, etc. without obtaining prior approval from Corizon's Utilization Management office in Lansing, Michigan.

31. When a Corizon MP wants to refer a prisoner to a specialist or surgeon, the MP fills out a "407 request" detailing the MP's clinical findings and reasons for requesting the referral.

32. Certain categories of 407 requests are subject to automatic approval per Corizon's written utilization management protocol. A team of three RNs at the Utilization Management office performs initial screening of 407 requests to determine if the request falls into a category that is subject to automatic approval. Any 407 request that is not subject to automatic approval per Corizon's written protocols is forwarded to Defendant Dr. Keith Papendick, M.D. for review.

33. Defendant Keith Papendick, M.D. is Corizon's Director of Utilization Management for Michigan prisons. He is a former family medicine practitioner who is not board-certified in any specialty.

34. At all times relevant to this Complaint, there was no Corizon employee other than Dr. Papendick who had similar job responsibilities with respect to Michigan prisoners.

35. Dr. Papendick initially has three options for responding to a 407 request: Approve, Alternative Treatment Plan ("ATP"), or Need More Information ("NMI").

36. When Dr. Papendick needs more information on a 407, he emails his request for additional information to the on-site treatment team. Once he receives the requested information, typically via email, the 407 request is then either approved or "ATP'd."

37. Dr. Papendick is an official with final decision-making authority with respect to whether 407 requests from on-site MPs are approved or ATP'd.

38. Corizon's Utilization Management Office for Michigan submits reports to corporate management detailing the number of 407 requests that are approved vs. ATP'd, with breakdowns by facility and by requesting MP. Dr. Papendick's supervisors base their assessments of his performance, at least in part, on the percentage of 407 requests that he approves.

39. When Dr. Papendick does not approve a 407 request, he must issue an Alternative Treatment Plan to the on-site MP.

40. Dr. Papendick is required to use the UpToDate database to make treatment decisions. UpToDate is a compendium of recommended courses of treatment for various ailments, based on clinical studies of patient outcomes observed for various treatment options.

41. Dr. Papendick processes approximately two thousand 407s per month, or approximately ninety per day. He checks UpToDate approximately four times per day.

42. Dr. Papendick's Alternative Treatment Plans are mostly a list of blurbs he has developed over the years that he copies and pastes.

43. Dr. Papendick does not typically approve a 407 request if UpToDate recommends a different course of treatment for the prisoner's ailment.

44. The UpToDate article for Mr. Jackson's ailment, a colovesical fistula, does not recommend permanent colostomy as a treatment option. UpToDate recommends either a single surgery to remove the damaged section of colon and attach the two ends (primary anastomosis), or a multistage operation involving creation of a temporary colostomy followed by colostomy reversal. See Ex. E: *UpToDate Treatment Recommendations for Colovesical Fistula.*

45. Dr. Papendick also does not approve 407 requests if he finds that "medical necessity" is not demonstrated for the requested treatment.

46. Dr. Papendick considers treatment to be "medically necessary" only if failure to provide the treatment would create risks to life or limb, or would create difficulty with Activities of Daily Living ("ADLs").

47. The six generally-recognized ADLs are bathing, dressing, eating, transferring (getting in and out of bed, or getting from a bed to a wheelchair), toileting, and continence.

48. Dr. Papendick's restrictive definition of "medical necessity" is not congruent with Corizon's contractual responsibilities under its contract with the State of Michigan, with MDOC policy, or with the constitutional standard for a "serious medical need" for purposes of the objective component of an Eighth Amendment deliberate indifference claim.

49. On or about April 18, 2017, a Corizon MP stationed at the Cooper Street Correctional Facility submitted a 407 request for a surgical consult for colostomy reversal for Mr. Jackson.

50. Sometime between April 18, 2017, and April 27, 2017, Dr. Papendick refused/deferred the request for a surgical consult for colostomy reversal for Mr. Jackson, because he determined that reversal of the colostomy was not "medically necessary."

51. The decision not to approve the request for a surgical consult for colostomy reversal was made by Defendant Papendick at Corizon's Utilization Management office, not by an MDOC employee. See Ex. F: *Letter from Office of the Legislative Corrections Ombudsman, November 7th, 2017.*

52. MDOC has a position for a Chief Medical Officer (CMO), as well as three positions for Assistant Chief Medical Officers (ACMOs). MDOC has had difficulty recruiting and retaining licensed physicians to fill these positions.

53. At the time the 407 for a surgical consult for colostomy reversal for Mr. Jackson was initially denied, the CMO position was vacant and two of the three ACMO positions were also vacant.

54. From March of 2017, when Mr. Jackson entered MDOC custody, until October of 2017, the sole remaining Assistant CMO, Dr. William Borgerding, was also serving as Acting CMO. Dr. Borgerding's office was located in the Kinross Correctional Facility in the Upper Peninsula.

55. Dr. Borgerding retired in October of 2017, leaving the CMO and all ACMO positions vacant.

56. In January of 2018, MDOC entered into an agreement with Wayne State University to provide a CMO, a Chief Psychiatric Officer (CPO), and an ACMO for one year on a contract basis. The CMO per the contract is Dr. Carmen McIntyre and the ACMO is Dr. James Blessman.

57. Neither Dr. Borgerding, Dr. McIntyre, nor Dr. Blessman had any involvement in the decision to deny Mr. Jackson access to a colostomy reversal.

58. MDOC policy does not prohibit surgical procedures to restore continence or improve a prisoner's quality of life. MDOC policy even permits surgical

procedures for sex-reassignment for transgender inmates. See Ex.: G: *MDOC Policy Directive 04.06.184.*

59. Although Mr. Jackson's colostomy was intended to be temporary, it was not reversed at any point during his two-year and two-month stay in the Michigan prison system.

60. Mr. Jackson suffered from pain, incontinence, ostracization and humiliation for the duration of his sentence. Both Defendant Prime Healthcare Services – Port Huron LLC and Defendant Corizon Health, Inc. frequently failed to provide Mr. Jackson with a sufficient supply of colostomy bags and patches, or to provide bags and patches that fit with each other or were the correct size for his stoma. When Mr. Jackson lacked appropriately-sized medical supplies, watery excrement and digestive juices would leak out of the stoma and onto his body, bedding, and clothes. Because a stoma does not contain a sphincter, Mr. Jackson had no ability to control the timing of his bowel movements in order to avoid defecating on himself.

**COUNT I:**
**DEPRIVATION OF SUBSTANTIVE DUE PROCESS RIGHTS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION**
**(Defendants Colleen Marie Spencer, David A. Kraus, and Prime Healthcare Services – Port Huron LLC)**

61. Plaintiff incorporates all previous paragraphs as if fully set forth herein.

62. The substantive component of the Due Process Clause of the Fourteenth Amendment guarantees access to adequate medical treatment for pretrial detainees in state custody. *Richmond v. Huq*, 885 F.3d 928, 937 (6th Cir. 2018).

63. In the context of the right to medical treatment, the constitutional protections afforded to pretrial detainees under the Fourteenth Amendment are more extensive than those afforded to sentenced prisoners under the Eighth Amendment. *See Richmond v. Huq*, 885 F.3d 928, 938 n.3 (6th Cir. 2018); *Miranda v. Cty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018); *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1120, 1122-25 (9th Cir. 2018); *Love v. Franklin Cty.*, 376 F.Supp.3d 740, 745-46 (E.D. Ky., Mar. 27, 2019).

64. Defendants Colleen Marie Spencer, Dr. David A. Kraus, and Prime Healthcare Services – Port Huron LLC were acting under color of state law when they provided or administered healthcare services for detainees at the St. Clair County Correctional Facility.

65. Plaintiff's need for treatment for his colovesical fistula constituted a serious medical need.

66. Defendant Dr. David A. Kraus ignored telltale signs of a fistula, such as flatulence and feces exiting Plaintiff's penis, from July to December of 2016, repeatedly prescribing antibiotics instead of transferring Plaintiff to a hospital for surgery.

67. Defendant Kraus' repeated failure to provide any treatment other than oral antibiotics, when feces and flatulence were exiting Plaintiff's penis and multiple courses of antibiotics had not resolved his symptoms, was objectively unreasonable and caused Plaintiff to experience unnecessary pain and suffering.

68. Plaintiff was finally transported to a hospital on December 6th, 2016. Dr. Erina Kansakar prescribed a plan of treatment for Plaintiff involving an emergency temporary colostomy to be performed on December 10th, 2016, and a reversal of the temporary colostomy, closure of the stoma and reconnection Plaintiff's large intestine to his rectal stump, on February 9th, 2017.

69. Defendant Colleen Marie Spencer interrupted and failed to implement Plaintiff's prescribed plan of treatment when she "postponed" the February 9th, 2017 surgery to reverse Plaintiff's temporary colostomy.

70. At the time that Defendant Spencer interrupted and failed to implement Plaintiff's prescribed plan of treatment, it was "clearly established" for purposes of qualified immunity that interrupting or failing to implement a prisoner's prescribed plan of treatment can constitute a constitutional violation in the Sixth Circuit. *Richmond v. Huq*, 885 F.3d. 928, 948 (6th Cir. 2018).

71. Defendant Spencer "postponed" Plaintiff's scheduled colostomy reversal surgery pursuant to an official or unofficial policy of her employer, Defendant Prime Healthcare Services – Port Huron LLC, to postpone surgeries for pretrial

detainees at the St. Clair County Correctional Facility if the detainee's condition is not emergent or life-threatening. Defendant Prime Healthcare Services – Port Huron LLC maintains this policy in order to pass the cost of expensive surgical procedures for detainees to MDOC, Medicaid, or other parties that will bear responsibility for the ex-detainee's medical costs once they are released or transferred from the St. Clair County Correctional Facility.

72. As a result of Defendants Colleen Marie Spencer and Prime Healthcare Services – Port Huron LLC's decision to postpone Plaintiff's surgery in order to pass the cost of the surgery onto others, Plaintiff experienced unnecessary pain, suffering, and humiliation.

## COUNT II:
## DEPRIVATION OF RIGHTS GUARANTEED BY THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION BY DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS
### (Defendants Corizon Health, Inc. and Keith Papendick)

73. Plaintiff incorporates all previous paragraphs as if fully set forth herein.

74. The Eighth Amendment forbids those responsible for the care and custody of state prisoners from acting with deliberate indifference toward an inmate's serious medical needs. *Blackmore v. Kalamazoo County*, 390 F3d 890, 895 (6th Cir. 2004).

75. At all times relevant to this Complaint, Defendant Corizon Health, Inc. was responsible for providing healthcare services to Michigan's incarcerated

population pursuant to an approximately $715.7 million, five-year contract with the State of Michigan.

76. Defendant Corizon Health, Inc. acts under color of state law when it undertakes and fulfills its responsibility for the healthcare needs of Michigan prisoners.

77. Pursuant to its contract with the State of Michigan, Defendant Corizon Health, Inc. is paid on a per-prisoner-per-month (PPPM) basis, rather than a fee-for-service basis. This means that the compensation that Defendant Corizon Health, Inc. receives for caring for a given prisoner in a given month is the same, regardless of whether Corizon provides extensive services or no services to that prisoner.

78. Since Defendant Corizon Health, Inc. is a for-profit corporation, and it is paid the same amount per month for each prisoner regardless of the care it provides, Defendant Corizon Health, Inc. has a strong financial incentive to deny medical care to Michigan prisoners whenever possible.

79. A different Michigan prisoner, Keith Swift, sued Defendant Corizon Health, Inc. in September of 2017 for allegedly refusing to reverse his temporary colostomy in order to avoid paying for the reversal surgery. The District Court found that this allegation, if true, would constitute deliberate indifference to a serious medical need in violation of the Eighth Amendment. *Swift v. Eldeman*, 2017 U.S. Dist. LEXIS 182524 at *2, *4 (W.D.Mich. 2017).

80. Defendant Corizon Health, Inc., through its final decisionmaker Defendant Keith Papendick, refused to approve a surgery to reverse Mr. Jackson's temporary colostomy, despite the fact that Mr. Jackson's prescribed plan of treatment included colostomy reversal. Defendant Corizon Health, Inc. made the decision to deny the Plaintiff a colostomy reversal; not an MDOC employee.

81. Defendants Corizon Health, Inc. and Keith Papendick were subjectively aware that Mr. Jackson had undergone the first step of the Hartmann procedure while in St. Clair County custody, that his plan of treatment called for reversal of his temporary colostomy, that he was living with a stoma, and that he was incontinent.

82. Mr. Jackson's need to undergo the second step of the Hartmann procedure in order to restore normal rectal function, close his stoma, and allow Mr. Jackson to control his bowel movements constituted an objectively serious medical need.

83. Defendant Corizon Health, Inc., through its final decisionmaker Defendant Keith Papendick, refused to reverse Plaintiff's colostomy in order to avoid paying for the procedure, so that it could retain a larger portion of the prisoner healthcare payments it received from the State of Michigan as corporate profit.

84. Between April and November of 2017, Mr. Jackson pursued and exhausted his administrative remedies with respect to Defendant Corizon's refusal to approve the surgery. See Ex. H: *Kohchise Jackson Grievances and Official Responses for Three-Step MDOC Inmate Grievance Procedure.*

85. Defendant Corizon's intransigence ultimately resulted in Michigan taxpayers, rather than Corizon, bearing the cost of Plaintiff's surgery. Plaintiff was paroled on May 16th, 2019. He successfully enrolled in the Healthy Michigan Plan, Michigan's Medicaid program, within two weeks of his release. He then obtained an appointment for May 31st, 2019 at Detroit Medical Center to be evaluated for colostomy reversal surgery. Michigan's taxpayer-funded Medicaid program paid for Mr. Jackson's surgery and lengthy post-surgery hospitalization, which lasted from June 19th, 2019 to June 28th, 2019.

86. Corizon's decision to leave Plaintiff to defecate uncontrollably into a bag taped to his stomach for over two years, in order to shift the cost of his reversal surgery onto Michigan taxpayers, caused the Plaintiff needless pain, suffering, humiliation, and loss of personal dignity.

WHEREFORE, Plaintiff demands judgment against Defendants, and each of them, in whatever amount he is found to be entitled, including punitive damages, plus costs, interest and attorney's fees.

Dated: January 3, 2020

Respectfully submitted,

*/s/Laurence H. Margolis*
Laurence H. Margolis (P69635)
214 S. Main St. Ste. 200
Ann Arbor, MI 48104
(734) 994 - 9590
Attorney for Plaintiff

## JURY DEMAND

Plaintiff, by and through his attorneys, demands a jury trial in this case.

Dated: December 3, 2020

*/s/Laurence H. Margolis*
Laurence H. Margolis (P69635)
214 S. Main St. Ste. 200
Ann Arbor, MI 48104
(734) 994 - 9590
Attorney for Plaintiff